### FERGUSON v. CORNELI SEED CO.

Circuit Court, Lake County.

March 18, 1951.

Walter Warren, Leesburg, for plaintiff.

LeRoy Collins, Tallahassee, for defendant.

T. G. FUTCH, Circuit Judge.

In this action which was tried to the court without a jury H. O. Ferguson sued the Corneli Seed Co., a Missouri corporation, for damages sustained by reason of the company having sold him, by name, 60 pounds of Black Diamond watermelon seed which he alleges failed to produce a crop of Black Diamond watermelons, but did produce a crop of melons which were not marketable.

The fact is not disputed that the defendant company shipped from its place of business in St. Louis the seed which the plaintiff planted. The company, however, denies that it sold the seed to the plaintiff, claiming that it sold the seed to Edwin Cauthen of Leesburg, of the Cauthen Grove Service Co., doing business in Leesburg.

The testimony shows that one Murphy, the defendant company's admitted sales agent in Florida, called on Cauthen in the late summer or early fall of 1949, to sell Cauthen seed for his own use and make inquiry as to others who might need to buy seed. Cauthen gave the agent the plaintiff's name and the agent called on plaintiff, reporting it back to Cauthen by written memorandum that plaintiff would notify Cauthen if plaintiff decided to buy the seed. This

agent made sales to two other parties and took an order from one of them. He later called again and wrote one order for the seed wanted by Cauthen, together with two other orders he had obtained, and the seed plaintiff had notified Cauthen he wanted. One of the parties to whom the agent sold later countermanded his order by a card directed to the defendant company, and the seed he had ordered was deleted from the order sent in by the agent.

The conclusion is inescapable that defendant sold the seed to Ferguson and not to Cauthen. The agent simply consolidated the order with Cauthen's consent for convenience in packaging and shipping. These facts also show privity of contract between plaintiff and the defendant.

Defendant says it disclaimed warranty of type by incorporating into its contract with Cauthen the following clause in paragraph 2 of the Growing Sales Contract—

> The seller agrees to plant, or endeavor to cause to be planted, during the season of 1949, an acreage of land, which will produce, under normal conditions an amount of seed of the varieties hereinafter named which will be sufficient to enable the seller to deliver the quantities of the said varieties herein contracted for, and the seller agrees to deliver such seeds in good merchantable condition, as hereinafter defined, and of good germination for the crop of the current year or on about December 1, 1949, or when, after harvest time, they are ready for delivery f.o.b. St. Louis unless otherwise specified, containers extra at cost.

And also in paragraph 7 of the Growing Sales Contract the following appears—

> Except as herein otherwise expressly provided, the seller gives no warranty, expressed or implied, as to the productiveness of any seeds, bulbs, or plants we sell, and we will not be in any way responsible for the crop. Our liability in all instances is limited to the purchase price of the seed.

Were this clause sufficient to avoid the implied warranty of variety, it would not be binding on the plaintiff, because the contract with him was verbal, and no reference was made to the alleged disclaimer. If on the other hand defendant sold the seed to Cauthen and not to plaintiff, then the alleged disclaimer would not bind plaintiff. So that defense must fall by reason of the facts.

Another defense interposed is that the seeds furnished were mixed by plaintiff with other seeds in replanting. This defense falls in the face of the undisputed evidence that the seeds which defendant claims were mixed in by replanting were part of a lot

carried over by plaintiff from the previous year, and from which lot he had planted and produced a good crop of true Black Diamond watermelons. The evidence shows the mixture of seeds to have been very light, except in a small isolated section of the field, where the ground was low and the original plantings were damaged by cold. So, this defense must also fall.

Defendant further defends that the field was not properly cultivated. The evidence establishes the fact that the field was cultivated in the manner and the method used by all successful growers in the Leesburg area, and that there was no neglect.

Defendant further defends that the field was not properly sprayed to prevent insects and disease. The testimony shows conclusively that they were sprayed all that was necessary. Byron Herlong, a man of known veracity, a college trained and practical horticulturist and farmer, who has had fourteen years' successful experience in growing watermelons, was employed to do the spraying. He testified that all necessary spraying was done.

Defendant further defends that the field should have been irrigated. This it failed to establish. On the other hand, the undisputed evidence shows that plaintiff, who has had several years' experience in growing watermelons, had irrigating equipment on the field, but rain came and made irrigation unnecessary.

The evidence by more than the required preponderance establishes the fact that the field was properly prepared; the seeds purchased by the plaintiff from the defendant properly planted, and thinned; the plants properly cultivated and fertilized, and the crop of melons properly pruned to the maturity of the first melons. The adverse or unfavorable growing conditions urged as a defense by the defendant have not in any way been shown to have existed. The contrary is shown by a preponderance of the evidence.

The fact that a good crop of some type of melons of good size was grown is not only established by the evidence, but is not disputed.

The fact that the melons produced would not pass inspection for grading out as United States No. 1 watermelons so that they could be shipped, is completely established and, in fact, is not disputed. The evidence shows that while literally hundreds of melons were cut in an effort to meet the grade, not a single melon was found that would pass inspection. Every melon cut from the field showed white meat, some with greenish tinge, some with pink around the seed rows, but never a melon with solid, bright red meat as is the prime characteristic of true Black Diamond watermelons.

The evidence given by Byron Herlong (mentioned above) and W. I. Brozier, a man of forty years' experience in growing, buying, and selling watermelons, and Speck Berry, a man with many years' experience in growing watermelons, George McCabe, a man who has grown melons for several years, and Owen Raney, who has spent a lifetime in growing melons, Bill Herbert, a trained watermelon inspector—all testified that the melons produced were of the citron type. Dr. Parriss, who is in charge of the watermelon laboratory at Leesburg, when called to the field soon after the trouble was discovered, and Dr. Jamison, of the College of Agriculture of the University of Florida, likewise called to the field at an early stage, both gave their official reports that the field showed heavy citron infestation. Mr. A. M. DeVaney, a state seed inspector, made a like report.

The evidence is clear that citron contamination will not appear in a watermelon produced by the blooms cross-pollinated by citron, so it makes no difference in this case if the cows had planted citron seeds which came up along with the so-called "Black Diamond watermelon seed," even though this had been closed range territory for many years, and no cattle had been there.

Under the conditions above stated, the plaintiff naturally and as a sane business man, abandoned the field, and it became the mecca of the curious as well as of growers who went to observe and to gain knowledge for future guidance in planting and harvesting watermelons.

Some time later, Mr. Carl Dietz, an employee of defendant company, appeared on the scene and thence followed, to say the least a startling and stunning chain of events.

He and Dr. Parriss (above mentioned) went to the field. They cut and color-photographed many small melons, and extracted much seed. Mr. Dietz stayed around several days, and upon leaving called upon Dr. Jamison at the University of Florida at Gainesville where he exhibited some melons represented by him to have been taken from the plaintiff's field. The melons were cut and the good doctor exclaimed, "Oh, my goodness, I must visit that field again." And visit the field again he did. Reaching Leesburg, he summoned Dr. Parriss, but did not contact the plaintiff, and together they hied off to the field. Dr. Jamison then came up with the theory that the nature of the melons produced was not "citron contamination," but "second growth due to adverse growing conditions." Dr. Parriss, bowing to his "boss" as he called him, said, "Me, too," and both changed their reports from "heavy citron contamination," to "adverse growing conditions."

Mr. Page, president and general manager of the defendant corporation, testified that "second growth had never been produced artificially." Dr. Jamison admitted that he did not know what he was talking about when he testified he was conducting experiments to determine the cause of "second growth." Is there such a thing as second growth? The evidence does not prove such. At best, it is only a theory.

The writer is not a scientist, but in the light of Mr. Page's testimony, it appears logical that the age of the seed may have been the cause of the trouble. While the contract with Cauthen called for seed grown in 1949, the testimony of defendant's witnesses establishes the fact that the seed furnished to plaintiff was grown in 1947. The contract with plaintiff is not shown to have specified new seed, but it is only logical that he expected new seed.

I doubt if there were, before this trial, five melon growers in Florida who knew it to be the practice of seed houses to sell seed so long as they would germinate in tests, regardless of age. Be that as it may, Mr. Page is a man of more than average intelligence and education in the science of horticulture. He stated that a seed is a living thing, that parts of its organism consist of certain genuii, which determine the characteristics of the product of that seed when planted and allowed to produce. He also testified the seed was in constant process gradually growing weaker (dying) until it lost its power of germination. Some gene other than that of the Black Diamond watermelons may have survived those of the Black Diamond to control the type of melon produced. I think Dr. Jamison and Dr. Parriss would do well to consider this possibility.

Mr. Simpson, Dr. Parriss, and probably some other witnesses testified that "second growth" would mature and turn red. The testimony in this case as well as the colored photographs establishes the fact that the white segments in those melons never did turn red.

The evidence establishes beyond a doubt that the crop produced from the seed was not a crop of Black Diamond watermelons, but was a crop of melons that would not meet the requirements for United States No. 1 grade watermelons.

The evidence shows that the crop produced, had the melons been Black Diamond watermelons, would have brought on the market the sum of $24,272.64, that the cost of harvesting, handling and loading would have been $2,424, that the plaintiff received from the sale of watermelons that would not grade out United States No. 1 to truck operators the sum of $1,100, leaving a net loss and damages to the plaintiff in the sum of $20,748.64. Judgment for such sum will accordingly be entered.